USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__7/9/2021___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
                         :

JORGE BATISTA,                  :

                Plaintiff,     :               20-cv-1254 (LJL)

       -v-                 :           OPINION AND ORDER

METROPOLITAN TRANSPORTATION AUTHORITY, :

                Defendant.    :

----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiff Jorge Batista ("Batista" or "Plaintiff") and Metropolitan Transportation Authority ("MTA" or "Defendant") each move for summary judgment on Plaintiff's complaint under the Federal Employer's Liability Act ("FELA"), 45 U.S.C. § 51 *et seq.*

For the following reasons, Defendant's motion for summary judgment on the issue of negligence is granted. Plaintiff's motion for summary judgment is thus denied.

## BACKGROUND

The following facts are undisputed for purposes of the present motion except where otherwise indicated.

Defendant is a public benefit corporation created by and organized under the New York State Public Authorities Law. *See* N.Y. Pub. Auth. Law § 1263 *et seq.* The MTA Police Department ("MTAPD") is a branch of the MTA created by statute. *Id.* § 1266-h. Metro-North Commuter Railroad ("Metro-North"), which is a public benefit corporation and subsidiary of the MTA, *id.* § 1265, operates the Brewster train station along Metro-North's Harlem line.

Plaintiff joined the New York City Police Department ("NYPD") as a police officer on January 10, 2005, and then joined the MTAPD as a police officer in January 2006. He is still employed as a police officer with the MTAPD.

In the late evening of March 3, 2017, Batista and his partner, officer John King ("King"), were working for the MTAPD. Batista and King were answering radio calls and making security checks at train stations along Metro-North's Harlem line. From midnight until 1:00 am on March 4, 2017, they were assigned to the Brewster station. While they were in the adjacent parking lot on the opposite side of Brewster station, Batista and King saw a person making graffiti in the station's overpass and went to confront the subject, later identified as Joseph Rothenbucher ("Rothenbucher") in the overpass. Rothenbucher resisted arrest. He grabbed his skateboard to swing it at Batista and King; King knocked the skateboard out of his hand and grabbed onto Rothenbucher. As Rothenbucher was resisting arrest, Rothenburger, Batista, and King fell through a set of double doors, with Batista closest to one of the doors and his back against the door. Batista claims that the three men just "flew through the door," Dkt. No. 24-3 at 44:12-15, but also testified that "it was more like [he] was pushed" against the door during the struggle, *id.* at 50:19-24. As soon as Batista went through the door, he fell down a three-story staircase that led from the overpass to the street below. When Batista stood up, he noticed King was running after Rothenburger away from the staircase and ran after them. Batista began to notice he was having difficulty breathing and requested an ambulance. He later discovered that he had suffered compression fractures in four vertebrae and was placed on sick leave.[1] He returned to full duty five months later, on August 10, 2017.

---

[1] Plaintiff received his base pay from the MTA's workers' compensation wage replacement program during his sick leave but asserts that he did not recover shift differential or overtime pay to which he was entitled. Dkt. No. 31 ¶ 24. Defendant also states that Plaintiff received 100%

Batista filed the instant complaint against the MTA on February 12, 2020, seeking $2,000,000 in damages together with the costs of the action. Dkt. No. 1 ¶ 20. The complaint alleges that the MTA caused Plaintiff's injuries by failing to provide a safe place to work, failing to promulgate safety rules, failing to warn Plaintiff of dangers, and failing to provide necessary tools and equipment. *Id.* ¶ 18. The complaint additionally alleges various defects in the configuration of the door, landing, and stairs at Brewster station: the lack of a lock, check, or resistive mechanism, the direction in which the door opened, and the existence of the door at the top of the stairs. *Id.* After Defendant filed an answer on April 14, 2020, the parties engaged in discovery before cross moving for summary judgment on March 31, 2020. *See* Dkt. Nos. 24, 25.

## LEGAL STANDARD

Summary judgment under Federal Rule of Civil Procedure 56 is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).

In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a). If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine

---

wage replacement during his time out of service pursuant to the MTA police officers' collective bargaining agreement. *Id.*

issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). It may not rely on "mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted), or "on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible," *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), and demonstrating more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment shall be denied. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9-10 (2d Cir. 1983). Where each party moves for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).

## DISCUSSION

FELA provides in relevant part: "Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51.

To recover damages under FELA, a plaintiff must demonstrate that:

(1) the defendant is a railroad engaged in interstate commerce; (2) the plaintiff was an employee of the defendant in interstate commerce, acting in the course of his employment; (3) the defendant or one of its employees or agents was negligent; and

(4) such negligence played a part, no matter how slight, in bringing about an injury to the plaintiff.

*Mele v. Metro. Transp. Auth.*, 2006 WL 2255080, at *2 (S.D.N.Y. Aug. 4, 2006) (quoting

*Mueller v. Long Island R.R. Co.*, 1999 WL 1201747, at *3 (S.D.N.Y. Dec. 14, 1999)).

A plaintiff must also "prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation." *Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 87 (2d Cir. 2006) (citing *Sinclair v. Long Island R.R. Co.,* 985 F.2d 74, 77 (2d Cir. 1993)). "At the same time, the plaintiff's burden in making a showing of causation and negligence is lighter under FELA than it would be at common law because 'the theory of FELA is that where the employer's conduct falls short of the high standard required of him by the Act and his fault, in whole or in part, causes injury, liability ensues.'" *Id.* (quoting *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 438-39 (1958)). "Despite this lenient standard, 'claimants must at least offer some evidence' as to each element of negligence." *Houser v. Norfolk S. Ry. Co.*, 264 F. Supp. 3d 470, 478 (W.D.N.Y. 2017) (quoting *Sinclair*, 985 F.2d at 77).

Neither party disputes that the first two elements are met—that the MTA is a railroad engaged in interstate commerce or that Plaintiff was an employee acting in the scope of his employment at the time of the accident. *See Mele*, 2006 WL 2255080, at *2 ("The MTA operates as an interstate common carrier within the meaning of the FELA.") (citing *Greene v. Long Island R.R. Co.,* 280 F.3d 224, 240 (2d Cir. 2002)). Instead, the parties dispute whether the MTA was negligent and whether that negligence caused Plaintiff's injury.

In particular, Plaintiff moves for summary judgment on the theories that: (i) the configuration was unsafe because it was reasonably foreseeable that someone could come into unwanted contact with a door that offered no resistance and fall down the stairs given the short landing platform; (ii) the MTA had actual notice of the hazardous configuration, based on

deposition testimony offered by Metro-North employee Wesley Kennen ("Kennen"), or at least constructive notice because the hazards of the configuration were "obvious and persistent"; and (iii) the MTA had a non-delegable duty to inspect the configuration that it inappropriately delegated to Metro-North.[2]  As to causation, Plaintiff argues that the configuration of the stairs, not the actions of third-party Rothenburger, caused him to fall down the stairs and resulted in his injuries.

Defendant moves for summary judgment and also responds with the arguments that: (i) there is no evidence that structure of the door, the landing directly inside the door, and stairs were unsafe or were considered unsafe; (ii) the Brewster station was constructed in accordance with state and railroad regulations; and (iii) the Brewster station frequently (and not long before the accident) was inspected by a Metro-North inspector, who did not find that the configuration constated a hazard.  As to causation, Defendant argues that it was third-party Rothenburger who caused Plaintiff's injury, not the configuration.

## I.     FELA

Plaintiff claims that the MTA breached its duty to "provide its employees with a reasonably safe place to work," including "the duty to maintain and inspect work areas." *Sinclair*, 985 F.2d at 76.  This duty includes a "nondelegable duty to provide its employees with a safe place to work even when they are required to go onto the premises of a third party over which the [employer] has no control."  *Haynes v. Cnty. Of Nassau*, 557 F. App'x 49, 52 (2d Cir. 2014) (quoting *Shenker v. Balt. & Ohio R.R. Co.*, 374 U.S. 1, 7 (1963)).  Neither party disputes that the MTA, as a railroad, owes this duty to its employees, including Plaintiff.

---

[2] Plaintiff also moved to dismiss Defendant's affirmative defense of Plaintiff's contributory negligence, but Defendant has since withdrawn the defense. *See* Dkt. No. 34 at 10.

A defendant breaches the duty "if it knew or should have known of a potential hazard in the workplace, and yet failed to exercise reasonable care to inform and protect its employees." *Tufariello*, 458 F.3d at 87 (quoting *Ulfik v. Metro-North Commuter R.R.*, 77 F.3d 54, 58 (2d Cir. 1996)). "This duty is ongoing; 'an employer's otherwise reasonable conduct may become unreasonable if the employer, after being informed that a condition is potentially dangerous, fails to investigate' and, if necessary, correct the problem." *Gallose v. Long Island R.R. Co.*, 878 F.2d 80, 85 (2d Cir. 1989) (quoting *Mohn v. Marla Marie, Inc.*, 625 F.2d 900, 902 (9th Cir. 1980)). "[W]hether the railroad used reasonable care in furnishing its employees a safe place to work is normally a question for the jury. And the right of the jury to pass on this issue must be liberally construed." *Sinclair*, 985 F.2d at 77 (quoting *Gallose*, 878 F.2d at 85); *see also Coale v. Metro-N. Commuter R.R. Co.*, 621 F. App'x 13, 14 (2d Cir. 2015) (Under FELA, "juries have more latitude to infer negligence than at common law").

The "touchstone" of the negligence inquiry is "the issue of foreseeability—whether or not [defendant] knew or should have known of the potential hazard." *Ulfik*, 77 F.3d at 58. "[T]o establish negligence, a FELA plaintiff need only prove 'that [the railroad] could have reasonably foreseen that [the condition] would increase the likelihood of injury, and that [the railroad] failed to take reasonable precautions.'" *Tufariello*, 458 F.3d at 91 (quoting *Ulfik*, 77 F.3d at 58); *see Syverson v. Consol. Rail Corp.*, 19 F.3d 824, 826 (2d Cir. 1994) ("Reasonable care is determined in light of whether or not a particular danger was foreseeable.") (citing *Gallick v. Balt. & Ohio R.R.*, 372 U.S. 108, 117 (1963)). The "catalyst" that ignites the duty to provide a safe workplace is "knowledge [of the problematic condition], either actual or constructive." *Gallose*, 878 F.2d at 85. "[A]n employer is not liable if it has no reasonable way of knowing that a potential hazard

exists because, unlike some other federal statutes, the FELA was never intended to hold an employer absolutely liable for workplace injuries." *Id.*

A.    **Foreseeability**

Plaintiff's brief centers on the MTA's design of the allegedly hazardous configuration of the door, landing, and stairs.[3]  It is undisputed that the door at the top of the overpass stairs opens one way, outward, onto a landing and toward the staircase.  The exact length of the landing is not clear from the record.  The door in question did not lock or have a latch.  The record suggests that there was no resistive or checking mechanism engaged on the door at the time of the accident.  Plaintiff alleges that these features of the door, combined with a short landing, above three-story stairs foreseeably increased the likelihood of injury, and that the railroad's failure to install a lock, check, or resistive mechanism in the door, failure to switch the direction of the hinges on the door, failure to remove a door "where none was needed," failure to act on complaints regarding the door, and failure to inspect the configuration constitute negligence that caused the Plaintiff's injury.  Dkt. No. 1 at ¶ 18.

If this configuration was in fact a hazard, the question is whether the MTA had actual or constructive knowledge about it—i.e., whether it was foreseeable that the configuration would increase the likelihood of injury and that the MTA failed to take precautions.

Foreseeability of injury under FELA is assessed at a relatively high level of generality.  A plaintiff does not need to show, for instance, "the particular danger that one of [the railroad's] employees [at the relevant location] might be attacked by an unknown and unprovoked individual," or that a dog had "vicious propensities."  *Syverson*, 19 F.3d at 827-28 (citing

---

[3] The complaint also references that Plaintiff's injuries were caused by the MTA's "fail[ure] to provide the plaintiff with the necessary and proper tools and equipment with which to work," Dkt. No. 1 at ¶ 18, but Plaintiff appears to have abandoned that allegation.

*Gallose*, 878 F.2d at 83). In those cases, the plaintiffs needed only to show the presence of potential hazards on railroad premises. Thus, Plaintiff need not show that it was foreseeable that a violent person would push a police officer through a closed door or that it was foreseeable that the police would need to make an arrest of a graffiti artist in order to establish liability. Plaintiff asserts that the fall was foreseeable because the configuration created "gravity related risks." Dkt. No. 37 at 12. If the configuration at the top of the stairs was dangerous in the ways Plaintiff claims, it would make all falling more likely, not just falling while-in-hot-pursuit. It would be sufficient that Defendant was aware of the general risk—that the configuration at the top of the Brewster station stairs was a type of configuration likely to precipitate or facilitate a fall. *See, e.g.*, *Kelly v. Metro-N. Commuter R.R.*, 37 F. Supp. 2d 233, 240 (S.D.N.Y. 1999) (a railroad "could only be found directly negligent if plaintiff ultimately proves [the railroad] knew or should have known the assailant was the type of person who might commit an assault").

In order to prove "the essential element of foreseeability, plaintiffs bringing FELA claims must offer 'proof of actual or constructive notice to the employer of the defective condition that caused the injury.'" *Esposito v. Long Island R. R.*, 2018 WL 4757948, at *4 (S.D.N.Y. Sept. 29, 2018) (quoting *Sinclair*, 985 F.2d at 77); *see also Murphy v. Metro. Transp. Auth.*, 548 F. Supp. 2d 29, 37 (S.D.N.Y. 2008).

### 1.    Actual Notice

Plaintiff has not offered evidence that, if the configuration was a hazard, that the MTA knew about the hazard.

Plaintiff's sole piece of evidence is deposition testimony from Metro-North employee Wesley Kennen ("Kennen"), who is the assistant director for stations and facilities on the Harlem line, which includes Brewster station. Kennen started visiting Brewster station in 2016 as part of his job duties and testified that he was there once or twice a month and overall six to eight times

in the six-month period prior to March 3, 2017. Dkt. No. 24-20 at 14-15. When he was at Brewster station, he would walk the platform and overpass to do an inspection to make sure that "things are getting done the way they are supposed to be getting done," for example, by "looking to see if the platform is getting properly salted," "double-checking to make sure the gutters don't have any leaks that are causing ice spots," and "[t]hings of that nature." Dkt. No. 24-20 at 16.

He testified that there are also two inspectors who inspect the stations on the Harlem line. *Id.* at 28. Their inspections are memorialized into a computer system or by email, including when the inspector has found nothing wrong at a station. *Id.* at 29-30, 46-47. The Brewster station is inspected every 35 days. *Id.* at 47.

Kennen described the configuration as a set of unlatched double doors that swing one way, outward toward the stairs, which open onto a landing of indeterminate depth. When asked what a passenger is supposed to do if "somebody was coming down the stairs at the same time" when the passenger is "opening the right leaf to gain entry into the overpass," Kennen responded, "Hopefully they wait for you." *Id.* at 21. Plaintiff claims that this phrase, "Hopefully they wait for you," is "demonstrative of [Kennen]'s cold merciless knowledge that if [the person] doesn't wait, the [passenger] will be violently struck by the opening door leaf and thereby likely swept off the landing and down the stairs." Dkt. No. 24-1 at 16. Plaintiff also claims that Kennen's testimony that a person standing on the platform "would have the other half of the landing to stand on while opening that door" in order to be clear of the other door opening, Dkt. No. 24-20 at 20, is proof of his "actual knowledge of the fact that the doors at the top of the stairway could not be safely opened . . . without exposing them to the gravity related risk of being struck by the opening door," Dkt. No. 37 at 11.

Plaintiff's description of Kennen's deposition testimony is a gross mischaracterization. "[A] defendant may not be held liable for creating a dangerous or defective condition upon property unless the defendant had actual, constructive, or imputed knowledge of the danger created." *Nussbaum v. Metro-N. Commuter R.R.*, 603 F. App'x 10, 12 (2d Cir. 2015) (quoting *Walsh v. Super Value, Inc.*, 904 N.Y.S.2d 121, 123 (2d Dep't 2010)). "Actual notice requires that a defendant receive complaints or similarly be alerted to the existence of the dangerous condition." *Id.*; *see also DeFilippo v. Nat'l R.R. Passenger Corp.*, 2019 WL 3531761, at *7 (S.D.N.Y. Aug. 2, 2019) (in a FELA case, "[a] defendant has actual notice [of an unsafe condition] if it either created the condition or received reports of it such that it is actually aware of the existence of the particular condition that caused the fall") (quoting *Decker v. Middletown Walmart Supercenter Stor*e, 2017 WL 568761, at *6 (S.D.N.Y. Feb. 10, 2017)).

As the deposition testimony makes clear, Kennen did not testify that he thought or knew that two people attempting to pass through the same doorway presented a dangerous condition. He testified, based on a guess as to how persons would pass each other through one door, that the person leaving the overpass to go down the stairs would wait for a person going up the stairs to cross through the doorway. Plaintiff did not ask Kennen why the person leaving the overpass could not choose instead to exit through the second door of the double doors. As the MTA put it, "That people exercise common courtesy in holding open a door, or waiting for a passenger to walk through the door while someone stands by the door on the overpass, is not disaster waiting to happen." Dkt. No. 34 at 6. Similarly, Kennen did not testify that he thought, knew, or was otherwise "alerted" to the fact that a person standing on one side of the landing while the other door opened was a safety hazard. The Kennen deposition refers neither to a degree of general danger associated with the configuration nor to the likelihood of falling.

In fact, Kennen testified that he had never been contacted about an incident where the door in the configuration had opened into and struck a person standing on the platform. Dkt. No. 24-20 at 33. He further testified that all but two of the 16 stations on the Harlem line have the same configuration, the two exceptions being the stations at North White Plains and White Plains. *Id.* at 23. He also testified that he was not aware of any complaints about the size of the landing, the fact that the doors open inward towards the stairs, or the location of the door at the top of the stairs. *Id.* at 27-28. When pressed, he testified that it was his reasonable guess that the door did not have a latch for "traffic flow," because if "they are latched and they close and they latch then . . . if there is a push bar it's more of an incumbrance." Dkt. No. 24-20 at 24. MTAPD Sergeant Christopher Nahman ("Nahman"), who had covered Brewster station in his inspection for damage, criminal activity, and suspicious activity—not to inspect the physical structures—also testified that he had "no recollection" of anyone contacting him from Metro-North to report problems with regard to the physical structures of Brewster station. Dkt. No. 24-15 at 32:15-32:23.

There was no testimony from any of the employees that Plaintiff deposed that they knew that the configuration was an unsafe condition or had heard that from others and failed to report it, nor did Plaintiff present documentary or any other evidence showing such actual notice. Although complaints and reports about a defect, or prior instances of similar accidents are not necessary to preserve the question of actual notice for the jury, *see, e.g.*, *Urie v. Thompson*, 337 U.S. 163, 178-79, (1949); *Mueller*, 1999 WL 1201747, at *5, Plaintiff has put forth no evidence that anyone at the MTA or Metro-North had actual notice of the configuration being dangerous. *See, e.g.*, *Haas v. Del. & Hudson Ry. Co.*, 282 F. App'x 84, 88 (2d Cir. 2008) ("[T]he vague evidence offered by Haas on this element is insufficient to reasonably justify a conclusion that

D&H knew or should have known about a problem with the switch"); *O'Hara v. Long Island R.R. Co.*, 665 F.2d 8, 9 (2d Cir. 1981) (plaintiff offered no evidence that defendant had notice that one tile was loose and one tile was missing from the floor of the train on which the employee worked); *cf. Higgins v. Metro-North R.R. Co.*, 318 F.3d 422, 427 (2d Cir. 2003) ("Because Higgins has not demonstrated that Metro–North was aware of any particular threat posed by Militano, Higgins cannot prove that the railroad was negligent with respect to its supervision of him.").

## 2. Constructive Notice

In the absence of any evidence of the MTA's actual notice, Plaintiff argues that the MTA had constructive notice that the configuration at Brewster station was a dangerous condition. He claims that an unsecured door, which opens outward onto a landing and then a three-story staircase, presents an obvious hazard that a person might fall off the landing and down the stairs. Defendant responds that neither the door nor the stairs are defective, because they function as intended; that they meet all applicable standards; and that they are not inherently dangerous.

Much of the case law on FELA concerns a slip and fall on stairs with debris or another defect that was not part of the structure. Here, however, Plaintiff's claim is that the configuration itself is inherently and "structurally defective." *McHale v. Westcott*, 893 F. Supp. 143, 148 (N.D.N.Y. 1995). In such cases, there needs to be evidence of the structural defect, i.e., in the way it was designed, to raise an issue of fact regarding whether the defendant had notice that the configuration is defective. *See Taylor v. United States*, 121 F.3d 86, 90 (2d Cir. 1997) (citation omitted) ("In constructive notice cases, the plaintiff must prove not simply that the defendant was generally aware of the existence of the dangerous condition, but that the defendant had notice of the 'particular condition' at issue."); *Smith v. N.Y. Enter. Am., Inc.*, 2008 WL 2810182, at *5 (S.D.N.Y. July 21, 2008) ("The constructive-notice inquiry . . . focuses on

the defect, namely whether it is visible and apparent and whether it existed for an ample amount of time to permit detection by defendant.").  Plaintiff has failed to provide such evidence.

Plaintiff relies again on the testimony of Kennen, as well as photos of the configuration that he claims, demonstrates that it was unsafe.  Specifically, Plaintiff asserts that the door hinges were installed backwards, as "readily apparent to any lay person who bothered to look" and that the doors were meant to open one-way inward into the overpass, and not outwards onto the stairs.  Dkt. No. 24-1 at 22.  Yet Plaintiff offers no evidence to support this ipse dixit assertion, especially in light of Kennen's testimony that 14 of the 16 stations along the Harlem line also had doors that opened out onto the stairs, suggesting that the stairs were not improperly installed. He also offers no evidence, expert or otherwise, that the configuration would have been safer with inward swinging doors as opposed to outward swinging doors.

To be certain, there is ample case law denying summary judgment for defendants on the issue of whether a "door swinging over steps may create a 'hazardous and unsafe' condition." *Griffin v. Sadauskas*, 787 N.Y.S.2d 721, 722 (3d Dep't 2005); *see also Burton v. State of New York*, 456 N.Y.S.2d 126, 127 (3d Dep't 1982) ("The uncontroverted expert proof is that it has always been considered to be a violation of acceptable engineering principles of good building design and construction, and hazardous and unsafe to have a door swing outward and over stairs."); *Hanley v. Affronti*, 718 N.Y.S.2d 753, 754 (4th Dep't 2000) ("[I]t was reasonably foreseeable that a person leaning against the door would fall down the stairs where, as here, the door was not latched shut.").  But those cases turn on the depth of the landing and not on the direction of the door swing.  *Burton* and *Hanley* featured no landing at all.  In *Griffin*, there was a "narrow landing" and "when the rear door was fully opened, a portion of that door overlapped the top steps of the basement stairs."  *Griffin*, 787 N.Y.S.2d at 721-722.

There is no similar evidence here. Kennen's statement implies a short landing, not deep enough to hold both an open door and a person. But Plaintiff admits that the landing is deeper than the depth of the door. Plaintiff submits several photographs of the station, including the configuration of the door, landing, and stairs. Dkt. No. 24-5. The door's arc ends well before the landing ends. The measurements shown in the photographs are incomplete, but the landing appears to be considerably deeper than four feet, perhaps five feet. The door is between 30 and 36 inches, *i.e.,* no more than three feet; this estimate is used by both parties. The doors are glass, which means that descending commuters can see that the door opens in the direction of the stairs, and ascending commuters can see anyone coming from the other side. A "pull" sticker is on each door facing the stairway so that a person ascending the stairway knows that the door swings outwards towards them. These pictures, even when combined with the Court's knowledge that the door did not have a lock, do not present so obvious a hazard as to put the railroad "on permanent notice . . . [of] an ever-present danger." *Herbert v. Nat'l R.R. Passenger Corp.*, 1995 WL 507289, at *2 (S.D.N.Y. 1995). Plaintiff also does not point to standards or regulations or testimony by which the platform could be judged as too small. Indeed, Plaintiff's own evidence argues that this configuration is itself standard. And although standards are not dispositive either way, they are admissible as "some evidence of the applicable standard of care." *Tufariello*, 458 F.3d at 91 (quoting *Robertson v. Burlington N. R.R.*, 32 F.3d 408, 410 (9th Cir. 1994)).

Although a defendant can have constructive notice of a structural defect in "plain view," the courts have required more than a plaintiff's mere allegation that the structure was defective. *Compare Haas*, 282 F. App'x at 88 ("That [the employee] found the switch difficult to throw does not provide a reasonable basis for a jury to find that [defendant] breached its duty to provide him with a safe workplace."), *and Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701

(2d Cir. 2010) ("[P]laintiff adduced no evidence indicating that [defendant] knew or should have known that license plate holders [mounted to the front of each car] posed a risk to workers. . . . Nor has plaintiff adduced any evidence suggesting that it would have been reasonable or beneficial for [defendant] to undertake a program of inspection that might have revealed the challenged license plate holder."), *with Gadsden v. Port Auth. Trans-Hudson Corp.*, 140 F.3d 207 (2d Cir. 1998) (inconveniently located handholds and footholds that could be seen from ordinary path of employee vehicles were alleged to have violated federal regulations), *and Mueller*, 1999 WL 1201747, at *8 (poor rail conditions in a frequently used section of track supported by employee affidavit that "track was old, worn and splintered with metal").

For example, in *Smith*, plaintiff presented a declaration from an architect that the entranceway, in which a door opened directly onto stairs, violated the building code and was improper and unsafe. *Smith*, 2008 WL 2810182, at *5; *see also Mattaliano v. Metro-N. Commuter R.R. Co.*, 2010 WL 4455826, at *3 (S.D.N.Y. Oct. 14, 2010) (triable issue where expert testified that crane used was unsafe). In *McHale*, Plaintiff retained an expert structural engineering who testified that the steps were defective "because the difference in height among the various risers varied by more than one-eighth of an inch and because the hand railing was not the proper height above the steps." *McHale*, 893 F. Supp. at 149; *see also id.* (nonetheless holding that "plaintiffs failed to produce any evidence tending to show that the defect was visible and apparent," because "none of the evidence supports the position that defendants should have been aware that the stairs' riser heights varied by more than one-eighth of an inch and that this variance constituted a structural defect").

Plaintiff offers no expert reports, nor does Plaintiff point to any deposition testimony or documentary evidence that suggests that there was a structural defect, much less that such defect

was visible or apparent, sufficient to permit detection by Defendant. The evidence is undisputed that almost all of the stations on the Harlem line had the same configuration as the configuration in the Brewster station and that the building configuration meets New York State and Metro-North standards. There is no evidence suggesting it would have been apparent to anyone that the landing was not sufficiently long to permit the doors to open outwards without creating a risk that a person on it would fall downwards or to create a risk that a person going through the doors from the overpass side would step onto the stairs and fall down them resulting in injury. There also is, for example, no evidence Defendant was aware that the configuration was structurally defective through internal reports, emails, or other communication. *See Melini v. 71st Lexington Corp.*, 2009 WL 413608, at *8 (S.D.N.Y. Feb. 13, 2009) ("The character of the defect, combined with the fact that yearly inspections did not discover the variation, showed that it was not an obvious hazard" and discussing *McHale*). Kennen testified that the MTA, through Metro-North, inspects the Brewster station every 35 days, and those inspectors did not report that they thought the configuration was unsafe or that others had reported it being so.[4] Discovery revealed no such official reports or communications, and it also did not indicate that employees knew the configuration was unsafe but failed to report it. *See, e.g.*, *Parente v. Metro. Transp. Auth.*, 2012 WL 1813077, at *3 (S.D.N.Y. May 16, 2012) (denying summary judgment where

---

[4] Defendant offers the declaration of Cliff Cerar ("Cerar"), a Metro-North employee, to support Kennen's testimony that there were no reports to the MTA or Metro-North of any structural issues or unsafe conditions with respect to the configuration and to assert that the configuration was built in accordance with New York Uniform Fire Prevention and Building Code and the Metro-North Station Guidelines, which were already submitted as exhibits. Cerar identifies himself as a Rule 30(b)(6) witness. *See* Dkt. No. 29. Plaintiff moves to strike this declaration as cumulative and because Defendant failed to identify Cerar in its Rule 26 disclosures, its interrogatories, and in response to Plaintiff's Rule 30(b)(6) notice. The Court need not decide the motion or consider Cerar's declaration because it finds that Cerar's declaration does not add anything additional to the testimony given by Kennen or Defendant's other witnesses or the documentary evidence submitted.

"although MTA employees noticed the presence of snow and ice in some areas of the parking lot prior to Plaintiff's arrival, none took any steps to report the condition to the MTA's central command"). Although the fact that the configuration met all applicable standards is not dispositive for Defendant**,** *see Tufariello*, 458 F.3d at 91 ("The fact that the [railroad] complied with [federal agency] regulations . . . does not conclusively demonstrate that the [railroad] was free from negligence"), there also is no evidence that the configuration departed from accepted practices, and "[c]ourts have declined to impute constructive notice to defendants where the allegedly defective conditions deviate from accepted practices by relatively small dimensions that could only be detected through structural analysis." *Deykina v. Chattin*, 2014 WL 4628692, at *8 (E.D.N.Y. Sept. 15, 2014) (collecting cases).

In the absence of any evidence supporting its claims, Plaintiff is left with the allegation that the configuration was dangerous and that the MTA knew it was dangerous based on its own ipse dixit. But the "FELA is not a strict liability statute" and the fact that a plaintiff is injured is "not proof of [defendant]'s negligence." *Piroscafo v. Metro-N. R.R. Co.*, 2012 WL 12892434, at *3 (D. Conn. Aug. 27, 2012), *aff'd sub nom. Piroscafo v. Metro-N. Commuter R.R. Co.*, 552 F. App'x 6 (2d Cir. 2013) (citing *Williams v. Long Island R.R. Co.*, 196 F.3d 402, 406 (2d Cir. 1999)). And while "it is true that there is a strong federal policy in favor of letting juries decide FELA cases, FELA is not an insurance program." *O'Hara v. Long Island R.R. Co.*, 665 F.2d 8, 9 (2d Cir. 1981) (per curiam). Plaintiff fails to raise a genuine disputed fact as to the MTA's actual or constructive notice.

### 3. Duty to Inspect

As a last effort, Plaintiff alleges that the MTA breached its non-delegable duty to provide a safe place to work by outsourcing inspections of the Brewster station to Metro-North, which it claims is a third party. Metro-North is a public benefit corporation and a subsidiary of the MTA

pursuant to New York Public Authorities Law § 1265. The law recognizes Metro-North as an extension of MTA with "all the privileges, immunities, and exemptions of the MTA." *Camara v. Metro-N. R.R. Co.*, 596 F. Supp. 2d 517, 520 (D. Conn. 2009); *see Kirk v. Metro. Transp. Auth.*, 2001 WL 25703, at *1 (S.D.N.Y. Jan. 10, 2001) ("Metro-North and the MTAPD are wholly owned subsidiary corporations of the MTA."); *cf. Colon v. Metro-N. Commuter R.R. Co.*, 242 F. Supp. 3d 65, 76-77 (D. Conn. 2017), *aff'd*, 778 F. App'x 7 (2d Cir. 2019) (rejecting MTA's argument that it did not control or possess the subject property because it had a "significant police presence along the railroad right-of-way," was a "signatory to the contract with the [Connecticut Department of Transportation] and Metro-North," and it "own[ed] Metro-North"). Section 1266(5) of the New York Public Authorities Law also authorizes the MTA to "cause any one or more of its powers, duties, functions or activities to be exercised or performed by [] one or more wholly owned subsidiary corporations." N.Y. Pub. Auth. Law § 1266(5); *see also Greene*, 280 F.3d at 236 ("MTA encompasses, as subsidiaries or as components for which MTA is financially accountable, many transportation agencies, including Metro-North" and holding that relationship between the MTA and Long Island Railroad ("LIRR") in which the MTA was "directly and integrally involved in essential business aspects . . . as well as in providing police services that are directly in furtherance as LIRR's business as a railroad" rendered the MTA an employer of LIRR and a common carrier). There thus is no evidence to support Plaintiff's claim that Metro-North is "a wholly independent and irrelevant third-party railroad operator." Dkt. No. 31 ¶ 3.

Moreover, even if Metro-North were independent of the MTA, there is nothing in FELA that would prohibit the MTA from contracting with Metro-North to conduct inspections. The non-delegable duty that FELA imposes on a railroad employer—to provide its employees with a

safe workplace—is intended to fix the responsibility, and thus, the liability for the unsafe workplace in a single place, with the employer railroad. *See Shenker*, 374 U.S. at 7-8; *see also Potthast v. Metro-North R.R. Co.*, 400 F.3d 143, 154 (2d Cir. 2005) (finding that the possible involvement of independent contractors did not allow defendant railroad to disclaim responsibility for a non-delegable duty). The logic, as the Supreme Court has explained it, is to prevent a group of railroads, which "by the simple expedient of doing each other's work, could tie their employees up in legal technicalities over the proper railroad to sue for injuries and perhaps remove from coverage of [FELA] a significant area of railroad activity." *Shenker*, 374 U.S. at 11. In effect, assuming there was an unsafe workplace, Defendant could not relieve itself from liability on the theory that Metro-North, and not Defendant, was negligent in maintaining the workplace. "It is a well-settled principle of agency law that a principal who has a non-delegable duty is responsible for his agent's violation of that duty." *McMahan v. Comm'r*, 114 F.3d 366, 371 (2d Cir. 1997). The doctrine of a non-delegable duty does not make Defendant liable when there was no unsafe workplace or when Plaintiff's injury was caused, not by the failure to maintain a safe workplace, but by the tussle at the top of the stairs. To so hold would be to make FELA the insurance policy that Congress eschewed in passage of the statute. Thus, given the Court's conclusion that the fact that the MTA or Metro-North did not have actual or constructive notice that the configuration was structurally dangerous is not genuinely in dispute, the MTA cannot be held liable merely by virtue of Metro-North's inspections of the Brewster station.

### B. Causation

"FELA's language on causation . . . 'is as broad as could be framed.'" *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 691 (2011) (quoting *Urie*, 337 U.S. at 181). A "relaxed standard of causation applies under FELA" where the "test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in

producing the injury or death for which damages are sought." *Id.* at 691-92 (citations omitted).

A showing of proximate cause is not required. *Id.* at 705. "[T]he 'any part' test is the 'single'

inquiry determining causation in FELA cases." *Id.* at 695 (quoting *Rogers v. Mo. Pac. R.R. Co.*,

352 U.S. 500, 507 (1957)).

The parties dispute whether the configuration of the doors, landing, and stairs "played

any part" in causing Plaintiff's injuries. Plaintiff claims that both parties agree that the only

cause of Plaintiff's injuries was the "subject accident . . . when he fell down 3 flights of stairs,"

Dkt. No. 24-1 at 25, and therefore Defendant "raises no issue" with regard to causation, Dkt. No.

30 at 27. Defendant responds that Plaintiff's contention essentially abandons his causation

claim, and "since Plaintiff failed to address MTA's argument about Rothenbucher's intervening

acts as the cause of Plaintiff's injury, MTA's motion should be granted." Dkt. No. 38 at 11-12.

Both parties agree that the fall caused the injuries. But it is clear from repeated reference

in the briefs that Defendant argues that the push by Rothenbucher was the sole cause of the fall

whereas Plaintiff argues that the configuration was an additional cause. This disagreement

constitutes a genuine disputed issue of causation between the two parties.

Defendant argues that the intervening acts of a third party, i.e., Rothenbucher's shove

against Plaintiff during their struggle at the top of the stairs, was the sole cause of the injuries.

Defendant points out that "Plaintiff admits that Rothenbucher violently shoved him down the

stairs." Dkt. No. 34 at 12. Rothenbucher's shove, Defendant contends, was not a foreseeable

consequence of the MTA's alleged negligence and therefore severs any causal chain.

But Rothenbucher's push is not the sole cause of Plaintiff's injury, as all events have

many but-for causes. The push appears to have been at least one cause of Plaintiff's injury, but it

does not rule out other causes. FELA does not require the employer railroad's negligence to

have been the sole or proximate or substantial cause of the employee's injury. Rather, "an employee who suffers an 'injury' caused 'in whole or in part' by a railroad's negligence may recover his or her full damages from the railroad, regardless of whether the injury was also caused 'in part' by the actions of a third party." *Norfolk & W. Ry. Co. v. Ayers*, 538 U.S. 135, 165-66 (2003). It cannot be said, based on the evidence, that the configuration did not play "any part at all" in Plaintiff's injury. If the direction of the hinges had been accidentally installed backwards—though there is no evidence to suggest so—a fall down the configuration after an unintentional shove would be more likely. And based on the current configuration, whether the direction of the doors would make a difference in the frequency of falling accidents at the location would likely depend on the past frequency of falling accidents, of which Plaintiff has submitted no evidence. The existence and precise magnitude of a possible safety improvement is an open question triable for a jury.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED as to breach of duty, Dkt. No. 25, and Plaintiff's motion for summary judgment is DENIED, Dkt. No. 24.

The Clerk of Court is respectfully directed to close Dkt. Nos. 24 and 25, and to terminate the action.

SO ORDERED.

Dated: July 9, 2021
New York, New York

_____
LEWIS J. LIMAN
United States District Judge